IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LEWIS EDWARD BYRD III,

        Plaintiff,

v.

BRANDON ARENZ,

        Defendant.

OPINION & ORDER

17-cv-191-jdp

---

  Pro se plaintiff Lewis Edward Byrd III is proceeding on a Fourth Amendment excessive force claim against defendant Brandon Arenz, a law enforcement officer. He alleges that Arenz shot at him 11 times and twisted his arm during an arrest. Arenz moves for summary judgment. Dkt. 23. Byrd asks that I deny Arenz's motion as a discovery sanction. Dkt. 67 and Dkt. 83. I will deny Byrd's motions. Whether Arenz's uses of force were unreasonable are questions for the jury, so I will deny Arenz's summary judgment motion, and I will recruit counsel to assist Byrd at trial.

PRELIMINARY MATTERS

  Byrd has filed two motions to sanction Arenz by denying his summary judgment motion. In the first motion, received on April 5, 2018, Byrd argues that Arenz should be sanctioned for failing to respond to Byrd's motion to compel by the court's deadline of March 29. Dkt. 67. But Arenz *did* respond to the motion to compel by the deadline. *See* Dkt. 62. So I will deny Byrd's April 5 motion.

  In the second motion, received on April 30, Byrd argues that Arenz should be sanctioned for deliberately withholding Arenz's firearm certifications, which were among the

documents listed in Byrd's motion to compel. Dkt. 83. I denied Byrd's motion to compel Arenz to produce his firearm certifications because Arenz indicated that he didn't possess the certifications. *See* Dkt. 66. Specifically, on March 29, Arenz submitted an affidavit from his attorney, Jason Prochnow, stating that he "has no additional items to produce in response to plaintiff's motion to compel, items 6 and 7." Dkt. 65, ¶ 10. Item 6 was "Arenz's firearm certifications and recertifications starting from his date of hire as a police officer til the day he resigned." Dkt. 61, at 1.

But now, it appears that Arenz *did* have additional items to produce in response to this request, because on April 19, he filed a record of his firearm certification with his reply brief in support of his summary judgment motion. *See* Dkt. 78-1. In response to Byrd's April 30 motion for sanctions, Arenz argues that he shouldn't be sanctioned because he produced the certification records on time. *See* Dkt. 84. Specifically, on May 7, Arenz submitted a second affidavit from Prochnow stating that Byrd's "first formal discovery request seeking all of defendant's firearm qualification records" is dated March 19, 2018, the same day that Byrd mailed his motion to compel. Dkt. 87, ¶ 4. This doesn't establish that Arenz produced all of the records within 30 days of receiving Byrd's request for them, nor does it explain the apparent inconsistency between Prochnow's two affidavits. In his summary judgment materials, Arenz explains that the certification record was not produced to Byrd beforehand because it "was maintained by a municipality other than Hillsboro." Dkt. 76, ¶ 2. But he doesn't explain when he obtained a copy.

Summarily denying summary judgment is a harsh sanction that is not called for in these circumstances, so I will deny Byrd's motion. But because Arenz only "produced" the firearm

2

certification to Byrd by filing it with his reply brief, I will not consider the firearm certification records submitted by Arenz at summary judgment.

UNDISPUTED FACTS

A brief description of some Western Wisconsin geography will be helpful before delving into the events at issue. Vernon County is located in rural Western Wisconsin. The Mississippi River forms the county's western border. Hillsboro is a small town near the eastern border. Hillsboro Fireman's Memorial Park is just to the west of town on Highway 33. If you drive east from the park on Highway 33, you pass through Hillsboro, cross the border into Juneau County, and reach Union Center, a small village about five miles northeast of Hillsboro. Union Center is in the southwestern corner of Juneau County, which stretches some 40 miles to the north.

One more preliminary note. Neither party submitted a declaration in support of their proposed facts: Arenz points to documentary evidence in support of his proposed facts; Byrd points to documentary evidence in support of some of his proposed facts, but other proposed facts lack evidentiary support. But because Byrd is a pro se litigant, I will accept his proposed facts as true if they relate to matters of which he has personal knowledge and do not constitute inadmissible hearsay, that is, to the extent that they would be admissible if they were stated in a declaration or affidavit.

The following facts are undisputed except where noted.

**A.  August 13, 2016**

Brandon Arenz was an officer for the Vernon County Sheriff's Office. On August 13, 2016, he "was assisting Vernon County with crowd control" at Hillsboro Firemen's Memorial

Park, where a tractor pull was taking place. Dkt. 77, ¶ 14. He was contacted by the Vernon County dispatcher, who "advised [him] that a vehicle that had been involved in several pursuits and felony fleeing in Juneau County was heading towards Union Center." Dkt. 26-1, at 2. Arenz got in his squad car and drove east through Hillsboro, toward Union Center. He stopped on Highway 33 somewhere near the county line, set spike strips on the road, and waited.

Soon, Arenz saw a car approach from the east—we now know that Byrd was driving that car. He saw another car, which the records generally refer to as the "civilian vehicle," turn west onto Highway 33 and head toward him. The civilian vehicle stopped before hitting the spike strips. Byrd stopped his car behind the civilian vehicle, then began to back up. At the same time, a third car approached from the east on Highway 33. This one was driven by Todd Kruger, an officer with the Elroy Police Department, who had been pursuing Byrd. Kruger's car, which was still moving westward, collided with Byrd's car, which was moving eastward in reverse. (The parties dispute how to characterize this collision: did Byrd's car hit Kruger's car, or the other way around? The reports are inconsistent.)

Arenz saw the collision and saw Byrd's car move forward into the eastbound lane of traffic. (Arenz says Byrd accelerated into the eastbound lane; Byrd says his car moved forward because of the collision's force and the gravity pulling it downhill.) Arenz stepped in front of Byrd's car and drew his gun. According to Arenz, he then ordered Byrd to stop; according to Byrd, Arenz didn't say anything. Byrd's car continued to move forward. Arenz fired 11 shots at Byrd's car as it moved past him. One of the bullets hit Byrd's elbow.

The car came to a stop, and Byrd got out and moved away from the road. Arenz followed on foot, drew his gun again, and ordered Byrd to stop. Byrd complied, raising his hands and getting onto his knees. Arenz handcuffed him. Byrd says that in the process, Arenz twisted his

4

arm and caused him to scrape his face. Arenz says he didn't, although he doesn't dispute that Byrd ended up "on the ground." Dkt. 77, ¶ 26. Byrd was later taken to the hospital, where he was treated for an abrasion on his elbow and a fractured bone near the elbow. It's unclear from the summary judgment record whether the fracture was caused by a bullet, Arenz twisting Byrd's arm, or Byrd falling to the ground.

**B. Byrd's criminal conviction**

In connection with the events of August 13, 2016, Byrd was criminally charged in Vernon County Circuit Court Case No. 2016-CF-115. On April 5, 2017, Byrd pleaded guilty to two counts of attempting to flee or elude a traffic officer, in violation of Wisconsin Statute section 346.04(3), and one count of reckless driving causing injury, in violation of Wisconsin Statute section 346.62(3).

At the April 5 plea hearing, Byrd admitted that the factual allegations contained in the criminal complaint were accurate. Those allegations align with Arenz's version of the August 13 events.

ANALYSIS

Arenz moves for summary judgment on Byrd's sole claim—use of excessive force. To succeed on his motion, Arenz must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law on the merits. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummet v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). If Byrd fails to establish the existence of an essential element on which he will bear the burden of proof

5

at trial, summary judgment for Arenz is proper. *See Celotex*, 477 U.S. at 322. All reasonable inferences from the facts in the summary judgment record must be drawn in Byrd's favor as the nonmoving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).

Arenz contends that I must accept his version of the events as true, because to do otherwise would imply the invalidity of Byrd's criminal conviction. In support of his argument, he cites *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Tolliver v. City of Chicago*, 820 F.3d 237 (7th Cir. 2016). *Heck* held that a person convicted of a crime cannot seek damages under federal law if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." 512 U.S. at 487. *Heck* does not automatically bar claims that are related to conduct that led to a conviction. *See id.* at 487 n.7. But as the Court of Appeals for the Seventh Circuit explained in *Tolliver*, if the plaintiff could not have been convicted under the version of events alleged in the civil suit, the court cannot enter judgment in the plaintiff's favor. *See* 820 F.3d at 244 ("[I]f the incident unfolded as Tolliver alleges in his civil suit, then he could not have been guilty of aggravated battery of a peace officer . . . . [B]ecause the allegations he makes now necessarily imply the invalidity of his conviction, *Heck* bars his civil suit.").

Arenz argues that under *Tolliver*, "Byrd is bound by the facts he admitted to in his guilty plea," that is, the allegations contained in the criminal complaint. Dkt. 24, at 2. But that's not the analysis that the court of appeals undertook in *Tolliver*. Rather, the court compared the elements of Tolliver's crime of conviction to Tolliver's allegations in the civil suit. *See* 820 F.3d at 242–43. Because the allegations did not fulfill the elements of the crime of conviction, the court could not take them as true without invalidating the criminal conviction, and therefore *Heck* mandated dismissal of the civil suit. In other words, "[a]s long as [the criminal] conviction

stands, [the plaintiff] is confined to a version of the facts that does not undermine the conviction." *Id.* at 246.

Here, Byrd pleaded guilty to two counts of attempting to flee or elude a traffic officer in violation of Wisconsin Statute section 346.04(3), which provides,

> No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operator's vehicle or extinguish the lights of the vehicle in an attempt to elude or flee.

Seemingly any type of risky driving while being pursued by a police vehicle with its lights activated (or other signal) violates section 346.04(3). *See State v. Williams*, 2017 WI App 85, ¶¶11–13, 379 Wis. 2d 368, 906 N.W.2d 184 (listing speeding, failing to stop for stop signs and a school bus, and "riskily and repeatedly pass[ing] other vehicles" as potential distinct violations of section 346.04(3)). The problem here is that the criminal complaint lists multiple potential violations of section 346.04(3). I haven't included them in the facts section above because there is no indication that Arenz knew about them when he confronted Byrd on August 13, but they include "swerv[ing] toward" a police vehicle, fleeing "at a very high rate of speed," and driving in the lane of oncoming traffic, in addition to "ramm[ing]" Kruger's car and "accelerat[ing] directly towards" Arenz. Dkt. 26-1, at 3, 4. The criminal complaint does not indicate which of these acts forms the basis for the two charges under section 346.04(3). (In fact, the criminal complaint lists only one count of attempting to flee or elude a traffic officer; Byrd pleaded guilty to the charges in an amended complaint, which Arenz has not provided to the court. But it appears that the amended complaint referred to the factual allegations in the

7

original complaint. *See* Dkt. 26-2, at 10.) So Byrd's version of the facts relevant to summary judgment does not undermine his conviction for attempting to flee or elude a traffic officer.

Byrd also pleaded guilty to one count of reckless driving causing injury in violation of Wisconsin Statute section 346.62(3), which provides,

> No person may cause bodily harm to another by the negligent operation of a vehicle.

The factual basis for this count is easier to identify, because the criminal complaint alleges that Byrd caused bodily harm to only one individual: Todd Kruger. Thus, he is confined to a version of the facts under which he injured Kruger by operating his vehicle in a manner that created an "unreasonable and substantial" "risk of death or great bodily harm." Wis. Criminal Jury Instructions § 2652 (2010). The only aspect of Byrd's version of events that might arguably undermine his conviction for reckless driving causing injury is his statement that Kruger "rearended" his car. Dkt. 77, ¶ 18. But Byrd could still be found guilty of reckless driving causing injury even if Kruger crashed into Byrd's car: "There may be more than one cause of bodily harm. The act of one person alone might produce it, or the acts of two or more persons might jointly produce it." § 2652 Comments n.9. Byrd doesn't deny putting his car into reverse and backing up after stopping behind the civilian vehicle. A reasonable jury could find that backing up on a highway while another car approaches creates an unreasonable and substantial risk of death or great bodily harm and that Byrd doing so was a cause of Kruger's injuries. So Byrd's version of the facts does not undermine his criminal convictions, and I will accept it as true for the purposes of deciding Arenz's summary judgment motion, and I will proceed to the merits of Byrd's claims.

Here, Byrd claims that Arenz used two types of excessive force: (1) Arenz shot at him while he was in his car; and (2) Arenz twisted his arm and scraped his face while handcuffing

him. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). Typically, when considering the totality of the circumstances, courts balance "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Objective reasonableness does not take into account an officer's underlying intent or motivation. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397.

I'll begin with the handcuffing incident, which Arenz does not address in his briefing. "[A]n officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). Moving a suspect's arm "with enough force to break it" is not "objectively reasonable" when the suspect is "fully cooperative." *Avina v. Bohlen*, 882 F.3d 674, 678 (7th Cir. 2018). Here, viewing the facts in Byrd's favor, Byrd was cooperating

9

with Arenz when Arenz pushed him to the ground, scraped his face, and twisted his arm—potentially with enough force to break his elbow—while handcuffing him. A reasonable juror could find that Arenz's use of force while handcuffing Byrd was objectively unreasonable.

Turning to the shots fired, shooting at a "fleeing motorist" in an "attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment." *Plumhoff*, 134 S. Ct. at 2021 (quoting *Scott v. Harris*, 550 U.S. 372, 386 (2007)). Arenz argues that this standard applies to Byrd's claim and mandates summary judgment in his favor. But just what is "a dangerous high-speed car chase that threatens the lives of innocent bystanders"? In *Plumhoff*, the defendant police officers had pursued the fleeing motorist, Rickard, at speeds exceeding 100 miles per hour for more than five minutes. During the chase, they passed dozens of civilian vehicles. When the officers fired their guns, Rickard's car had come to a "near standstill," but only because it had collided with a police car—and the officers could see that Rickard was pushing on the accelerator because the wheels of his car were spinning. *Id.* The Supreme Court explained: "Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id.* at 2022.

The circumstances that Arenz faced on August 13 were very different. Viewing the facts in Byrd's favor, when Arenz pulled the trigger, here's what he knew: Byrd was being pursued by law enforcement officers and was "fleeing." Dkt. 26-1, at 2. Byrd approached Arenz on the highway, followed by Kruger's squad car. When the civilian vehicle stopped in front of Byrd, Byrd stopped, too. Byrd then put his car into reverse and started to back up, despite the fact that Kruger's car was coming toward him on the highway. Kruger's car hit Byrd's car, and

Byrd's car began to roll slowly downhill, in the direction of the spike strips. A reasonable juror could find that under those circumstances, Arenz acted unreasonably when he fired his gun at Byrd, because it was not apparent Byrd was intent on resuming highly dangerous flight.

Arenz contends that he is nevertheless entitled to summary judgment under the doctrine of qualified immunity. This doctrine "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' . . . Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); and *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 136 S. Ct. at 309).

Byrd argues that *Tennessee v. Garner* clearly established that "where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 471 U.S. 1, 11 (1985). But more recently, the Supreme Court held that "the use of *Garner*'s 'general' test for excessive force was 'mistaken.' The correct inquiry [is] whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the '"situation she confronted . . . ."'" *Mullenix*, 136 S. Ct. at 309 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

11

The United States Supreme Court has "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Id.* at 310. But the Seventh Circuit Court of Appeals has. In *United States v. Bradley*, 196 F.3d 762 (7th Cir. 1999), a jury found a police officer guilty of the crime of willfully depriving a person of constitutional rights under color of law when he fired his gun at a vehicle that was driving at the speed limit—25 miles an hour—but did not stop when the officer activated his unmarked car's emergency lights. The officer initiated the pursuit because the vehicle "roll[ed] through a stop sign." *Id.* at 765. The Seventh Circuit concluded that there was sufficient evidence to support the jury's finding that the officer had used excessive force in violation of the suspect's rights under the Fourth Amendment. *Id.* at 769. (Because *Bradley* concerned a criminal prosecution, the qualified-immunity defense was not raised.)

In terms of danger to the public, the Byrd incident lies between the poles established by the ongoing high-speed chase in *Plumhoff* and the slow-speed one in *Bradley*. As in *Bradley*, Byrd was travelling at slow speed, and there is no information that Arenz was aware that Byrd had been travelling at speeds that would pose an inherent risk to the public, as in *Plumhoff*. In *Bradley*, the Court of Appeals described the police officer as a Dirty Harry–like vigilante, 196 F.3d at 765; that's a far cry from Arenz's conduct. But *Bradley* provides an officer notice that it is unlawful to shoot at a slow-moving vehicle when the vehicle's driver does not appear intent on taking flight in a highly dangerous manner. Viewing the facts in the light most favorable to Byrd, Arenz did just that. The facts that would support Arenz's qualified immunity defense are genuinely disputed. So I will not grant summary judgment on Arenz's qualified immunity defense concerning the shots fired at Byrd, although Arenz may assert the defense at trial.

Arenz does not assert a qualified immunity defense concerning the use of excessive force while handcuffing Byrd, so that claim will proceed to trial as well.

Finally, Byrd renews his motion for the court's assistance in recruiting counsel. Dkt. 91. From my review of the case, it appears that recruiting counsel would be appropriate. So I will attempt to recruit counsel to represent Byrd at trial.

## ORDER

IT IS ORDERED that:

1. Plaintiff Lewis Byrd's motions for sanctions, Dkt. 67 and Dkt. 83, are DENIED.

2. Defendant Brandon Arenz's motion for summary judgment, Dkt. 23, is DENIED.

3. Plaintiff's motion for assistance recruiting counsel, Dkt. 91, is GRANTED.

4. The schedule in this case is STRUCK and proceedings are STAYED pending recruitment of counsel for plaintiff. If I find counsel willing to represent plaintiff, I will advise the parties of that fact. Soon thereafter, a status conference will be held to establish a new schedule for resolution of the case.

Entered June 25, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge